# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**GLADYS E. WARREN,**

                          **Plaintiff,**

**-vs-**                                         **Case No.  6:05-cv-254-Orl-JGG**

**COMMISSIONER OF SOCIAL
SECURITY,**

                          **Defendant.**
_____

## MEMORANDUM OF DECISION

Plaintiff Gladys E. Warren ["Warren"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying Warren's application for a period of disability, disability insurance benefits and supplemental security income.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the case is **REMANDED** to the Commissioner for further proceedings.

## I.    PROCEDURAL HISTORY

On March 13, 2002, Warren applied for Social Security Disability Insurance benefits and Supplemental Security Income under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416, 423.  R. 56-58, 469-475. The claims were denied at the initial level on September 13, 2002, R. 34-35, 479-80, and a Request for Reconsideration was filed on October 25, 2002.  R. 36.  The claim was again denied on January 16, 2003.  R. 37-38, 483-85.  Thereafter, Warren timely filed a Request for Hearing.  R. 39.

The Honorable Philemina M. Jones, Administrative Law Judge ("ALJ"), held a hearing on July 8, 2004.  R. 493-533.  Joseph Agrusa, a Vocational Expert ("VE"), and Warren testified at the hearing.  On September 23, 2004, the ALJ issued an unfavorable decision.  R. 13-22.  The ALJ concluded that Warren could perform her past relevant work and therefore was not disabled.[1]  R. 22, Findings 8-9.

Warren requested review of the ALJ's decision on November 18, 2004, but presented no new evidence to the Appeals Council.  R. 11.  On December 17, 2004, the Appeals Council denied the request for review.  R. 7-10.  On February 18, 2005, Warren timely appealed the final decision to the United States District Court.  Docket No. 1 at 1.  On September 25, 2005, Warren filed in this Court a memorandum of law in support of her appeal.  Docket No. 14.  On November 15, 2005, the Commissioner filed a memorandum in support of her decision that Warren was not disabled.  Docket No. 15.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Warren assigns three errors to the Commissioner.  First, Warren claims that the Commissioner erred in determining Warren's residual functional capacity based on the State Agency doctor without giving greater weight to Warren's treating psychiatrist.  Second, Warren claims that the Commissioner erred in posing a hypothetical question to the VE because the question did not adequately reflect Warren's limitations.  Third, the Commissioner erred in not crediting Warren's testimony regarding

---

[1]The Social Security ALJs face a herculean task.  The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals.  With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases.  The effects are felt in the district court.  According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation.  Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year  —  an average of about one per week.

her limitations.  The Commissioner argues that substantial evidence supports her decision to deny disability, and that the ALJ applied the proper legal standards.

### III.    THE STANDARD OF REVIEW

#### A.    AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

## B.     REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.   42 U.S.C. § 405(g)(Sentence Four).   The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.   *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).   This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.   *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).   A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

## C.     REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences.   *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).   To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.

*Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).   On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.   *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).   After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is

a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also, Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[2] *Id.*

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

### A.    DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### B.    THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, he is not disabled.  20 C.F.R. § 404.1520 (b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520 (c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is

disabled.  20 C.F.R. § 404.1520 (d).  Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.  20 C.F.R. § 404.1520 (e).  Fifth, if a claimant's impairments (considering his residual functional capacity, age, education, and past work) prevent him from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520 (f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423 (d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the

ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether a claimant can perform past relevant work despite his or her impairment.  20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.  *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant.  *See* SSR 82-61.  If so, the claimant is not disabled.  If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy.  SSR 82-61.  In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.R. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416 (i)(3); 423(a), (c).  If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability.  *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

## C.     OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the

Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote*, 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must

make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.   TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527 (d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527 (d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527 (e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527 (e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence.  *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

-12-

### E.   PAIN

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; *Walker*, 826 F.2d at 1003.
Congress has determined that a claimant will not be considered disabled unless he furnishes medical
and other evidence (*e.g.*, medical signs and laboratory findings) showing the existence of a medical
impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C.
§ 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including
pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with
the objective medical evidence.  20 C.F.R. § 404.1529.  In determining whether the medical signs and
laboratory findings show medical impairments which reasonably could be expected to produce the
pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either
> (2) objective medical evidence that confirms the severity of the alleged pain arising
> from that condition or (3) that the objectively determined medical condition is of such
> a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone
can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*,
957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself,
conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.   CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate
specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.
*Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th
Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not

disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.     MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986). In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (failure to order such an evaluation may be

reversible error).   Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### H.     THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — *i.e.*, limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for

mental disorders (activities of daily living; social functioning; concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work). A "marked" degree of limitation means more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress). This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In some cases, descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

-16-

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not adequately describe these individuals' sustained ability to function.  It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress.

20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, *e.g.*, hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist.  These functional restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

V.       **APPLICATION AND ANALYSIS**

A.       **THE FACTS**

At the time of the hearing, Warren was fifty-five years old and lived with her husband and two children, a twelve year old girl and a ten year old boy.  R. 499.  Warren has a total of seven children, some of whom apparently are adults.  R. 396.  Warren obtained her GED, and then attended college

-18-

for approximately one and one-half years, but did not obtain a degree or certificate of any kind.  R. 69, 500.  Warren's past relevant work was that of a motel maid and shrimp production worker.  R. 64, 501.  These jobs required Warren to stand for 8 hours, to frequently lift 10 pounds, with the heaviest weight being 20 pounds.  R. 64.  The VE determined that both jobs are unskilled jobs with light exertional demands.  R. 125-26.

Warren testified that she last worked for two days in 1999, and that she stopped working because it was too much pressure and the noise was too loud for her ears.  R. 515.  In a Disability Report completed by Warren on January 31, 2001, Warren stated that she stopped working in approximately 1998 to take care of her children.  R. 62-71, 63.  Warren further stated that she became unable to work on June 1, 2000, because of her illnesses, injuries or conditions.  R. 63.  Warren testified that she had both physical and mental problems, but the mental problems were the worst.  R. 502-03, 516.  At the hearing before the ALJ, Warren amended her disability onset date to June 28, 2001, the date she began treatment with Dr. Winters.  R. 61, 394-98.

### 1.    Plaintiff's Mental Condition

During Warren's first visit with Dr. Winters on June 28, 2001, Dr. Winters noted several problems with Warren's mental functioning during the mental status examination.  R. 397.  He noted that Warren's mood was "sad, depressed, nervous, worried, upset, terrible, irritable, angry and fearful."  *Id.*  Dr. Winters documented her affect as being "superficially bright," but also "frustrated, annoyed, depressed, and anxious."  *Id*.  Additionally, Dr. Winters stated that Warren exhibited "somewhat clear" content of thought, and "somewhat paranoid" thoughts.  *Id*.  Warren reported hearing the phone ringing with nobody actually on the line, and Dr. Winters concluded Warren was

-19-

probably had hallucinations. *Id.* Furthermore, Dr. Winters opined that Warren had impaired cognition with fair judgment and poor insight. *Id.* Dr. Winters also observed and noted that Warren experienced a panic attack with labored breathing during the initial interview. *Id.* After the initial mental status examination Dr. Winters diagnosed Warren with Psychosis with Depressive Features, and a Global Assessment of Functioning score [hereinafter "GAF"] of 40.[3] R. 398. Thus, Dr. Winters prescribed Risperdal and Zoloft. *Id.*

On July 16, 2001, Dr. Winters noted that Warren was "somewhat disheveled" and, again "superficially bright." R. 393. Warren reported persistent "hearing cats or something," but was guarded in her statements regarding these experiences. *Id.* At the next follow-up appointment on August 14, 2001, Dr. Winters noted that the Risperdal caused Warren to be somewhat lethargic after taking the medication in the morning, and Warren stated that she needed to take her medicine at night. R. 391. Dr. Winters noticed that Warren's mood was incongruent with laughter, and that she was positive for "voice like subconscious thinking out loud" and positive perceptual disturbances. *Id.* Thus, Dr. Winters diagnosed Warren with Depression, Recurrent, Severe with Psychotic Features, and increased the dosage of both prescription drugs. *Id.* Thereafter, on September 18, 2001, it was noted that Warren continued to experience perceptual distortions "once in a while," hearing mumbling voices, and feelings of paranoia. R. 390.

---

[3]The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) [hereinafter "DSM-IV"] at 32. A GAF code of 41 - 50 indicates serious symptoms, or serious impairment in social or occupational functioning (e.g., no friends, unable to keep a job). DSM-IV at 32. A GAF code of 31 to 40 is worse — the individual has some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. DSM-IV at 32.

On October 15, 2001, November 12, 2001, and December 10, 2001, Dr. Winters again diagnosed Warren with Depression, recurrent, severe with psychotic features.  R. 387-89.  Warren's primary complaints during these sessions relate to family difficulties, including her fear that her husband is cheating on her again, feeling "cornered" by her family, concerns about her children being removed from her care due to neglect charges, children being "too dependent," and frustration with her children who will not work.  *Id.*

On December 21, 2001, Warren indicated that she had noticed some improvement since she began taking the Gabitril she was prescribed at her last visit and that she was negative for delusions. R. 386.  Dr. Winters noted, however, that Warren "presented as bright on approach, yet has persistent relationship problems" and the previous diagnosis remained the same.  *Id.*  At the next appointment on February 7, 2002, Warren reported she was living in a motel, and was experiencing stress because of this situation.  R. 384.  Warren stated that her sleep had been poor recently, but no delusions elicited. *Id.*

On March 6, 2002, Dr. Winters noted that Ms. Warren was "childlike and somewhat disheveled, was asking "impoverished" questions, and was minimally redirectable from these questions. R. 383.  After this meeting, Dr. Winters added General Anxiety Disorder to the previous diagnosis.  *Id.*  Then, on May 8, 2002, Warren reported experiencing audiovisual hallucinations, but "not hurtful ones."  R. 381.  She stated she could not "really hear what they're saying" and she continued to hear knocking and seeing things drop.  *Id.*  Warren reported these experiences caused her increased anxiety and distress, and she noted that she was experiencing trouble with her activities of daily living and sleeping.  *Id.*  At the next appointment with Dr. Winters on July 16, 2002, he noted

Warren to have a poor mood and a tense affect.  R. 380.  Thus, he prescribed an additional medication, Prozac. *Id*.  She was, however, negative for delusions.  *Id*.  On August 14, 2002, Warren stated that she felt like she was "having a stroke" and felt like she "could explode when upset."  R. 379.  Warren reported that she continued to experience poor sleep, and her appetite was down.  *Id*.  Dr. Winters concluded she was at "probable baseline."  *Id*.  The following month, Dr. Winters adjusted Warren's medications, including adding Trazadone as a sleep aid and decreasing the Gabitril.  R. 378.

Thereafter, on November 20, 2002, Warren reported continued problems at home.  R. 377. Dr. Winters noted that Warren had "some labile responses" to questions, that she was, once again, superficially bright, and that she continued to experience increased anxiety with poor appetite and fluctuating sleep.  *Id*.  Warren's diagnosis remained the same. *Id.*  During the visit on January 23, 2003, Warren reported feelings of hopelessness, having audio hallucinations ("calling home"), and persisting multiple stressors that affect her mood.  R. 375.  She exhibited shortness of breath and increased distress when discussing her problems, and was given water.  *Id*.

On January 10, 2003, Dr. Susan Conley, Ph.D. completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique form.  R. 348-64.  Dr. Conley did not perform a multi-axial evaluation and did not assess Warren's GAF.  Dr. Conley concluded that Warren was not significantly limited in 15 categories listed on the form, and was moderately limited in 5 categories listed on the form.  R. 362-63.  Dr. Conley noted that Warren had been treated with medications on an outpatient basis since June 2001 for major depression with psychosis, that Warren had chronic problems with sleep and appetite, and experienced low level voices or sounds.  R. 360. Dr. Conley concluded that:

> [Claimant] reports depression with some anxiety for 2 yrs.  Very
> stressful home life.  Has been generally compliant [with treatment] on
> [outpatient] basis - meds.  She is likely to have difficulty & be overly
> sensitive to criticism.  She is able to drive, do errands, care for her
> needs.  She appears able to perform a single, repetitive task.  R. 364.

On January 23, 2003, Dr. Winters completed a Treating Psychiatrist Mental Health Form. R. 373-74.  In this form, Dr. Winters indicated that Warren's condition was currently worsening and her quality of thinking was "superficially bright."  R. 374.  He stated that Warren's thought process continued to demonstrate incongruence with laughter or smiling when describing increased distress. *Id*.  She continued to experience paranoid themes and audiovisual hallucinations that were non-command in nature. *Id*.  Dr. Winters also opined that Warren's ability to concentrate and her memory were both "poor."  *Id*.  Finally, Dr. Winters indicated that Warren's prognosis was "poor" and that she continued to experience increased anxiety and decompensation.  R. 373.  His multi-axial evaluation was: Axis I – 296.34 [Major Depressive Disorder, Recurrent, Severe with Psychotic Features[4]]; Axis II - deferred; Axis III – HTN, GI distress, stress.  R. 374.

On February 24, 2003, Warren reported that she gets so upset and depressed that she feels as if she will "explode."  R. 461.  Dr. Winters noted worsening anxiety with increased distress, and audiovisual hallucinations when Warren was upset.  *Id*.  In regards to these hallucinations, Warren

---

[4]The DSM-IV at 345 and 377-78 establishes the diagnostic criteria for Major Depressive Disorder, Recurrent.  The diagnostic criteria for Major Depressive Disorder are the presence of two or more major depressive episodes including: depressed mood most of the day, nearly every day; markedly diminished interest or pleasure in all, or almost all activities most of the day, nearly every day; significant weight loss; insomnia or hypersomnia nearly every day; psychomotor agitation or retardation nearly every day; fatigue or loss of energy nearly every day;  feelings of worthlessness or excessive or inappropriate guilt nearly every day; diminished ability to think or concentrate, or indecisiveness, nearly every day; recurrent suicidal ideations. The diagnosis code is 296.3x.  The last digit in the diagnosis code is reserved as a severity specifier for the most recent Major Depressive Episode that forms part of the disorder, and .x4 indicates "Severe with Psychotic Features."  Even without psychotic features, a "severe" Major Depressive Episode is one that has "several symptoms in excess of those required to make the diagnosis, **and** *symptoms markedly interfere with occupational functioning* or with usual social activities or relationships with others."  DSM-IV at 378 (bold emphasis in original, italics added).  The severity specifier "Severe with Psychotic Features" adds delusions or hallucinations as an additional criteria for diagnosis.  *Id*.

stated that she heard "noises," either whispering or yelling, but that she could not understand the noises. *Id*. Again, on July 22, 2003, Dr. Winters noted Warren to be superficially bright and anxious with fluctuating sleep and appetite. R. 459. She was, however, in the process of moving and Dr. Winters stated she presents with increased organization. *Id*. The next month, Warren reported that things are "a little better" since her adult children moved out and she has a new grandchild. R. 458. Warren had decreased audiovisual hallucinations and was negative for overt delusions elicited. *Id*. Thereafter, on September 17, 2003, Dr. Winters noted that Warren presented "in clean clothing today with increased hygiene stating that she is thinking about getting a hair cut/color." R. 457. But, he also noted that she continued to demonstrate distress due to family and psychosocial issues. *Id*.

Dr. Winters also completed a Mental Residual Functional Capacity Questionnaire on September 17, 2003. R. 366-70. The DSM-IV Multiaxial Evaluation was as follows: Axis I – 296.34 [Major Depressive Disorder, Recurrent, Severe with Psychotic Features]; 300.02 [Generalized Anxiety Disorder]; Axis II – deferred; Axis III – HTN, GI distress, stress; Axis IV – severe psychosocial maladaptation, legal issues and onset grief; Axis V – Current GAF: 55; Highest GAF past year: 50.[5] R. 366.

In this form, Dr. Winters clinical findings were: episodic panic attacks that cause shortness of breath, poor concentration, debilitating fear with anxiety/anergia, anhedonia, and usually disheveled, somewhat disorganized. *Id*. Dr. Winters indicated that Warren exhibited the following signs and symptoms in regards to her mental condition: anhedonia; decreased energy; inappropriate affect;

---

[5]A GAF score of 51 - 60 indicates "moderate symptoms" (e.g., flat affect and circumstantial speech, occasional panic attacks) OR "moderate difficulty in social or occupational functioning" (e.g., few friends, conflicts with peers or co-workers). DSM-IV at 32.

feelings of guilt or worthlessness; persistent anxiety; mood disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience; psychomotor agitation or retardation; persistent disturbances of mood or affect; apprehensive expectation; paranoid thinking or inappropriate suspiciousness; recurrent obsessions or compulsions which are a source of marked distress; emotional withdrawal or isolation; perceptual or thinking disturbances; emotional lability; deeply ingrained, maladaptive patterns of behavior; easy distractability; sleep disturbance; panic attacks. R. 367. Therefore, Dr. Winters concluded that Warren either was unable to meet competitive standards or had no useful ability to function in all listed mental abilities and aptitudes needed to do unskilled, semi-skilled or skilled work. R. 367-69. Dr. Winters also indicated that Warren would be absent four or more days per month due to her condition. R. 370. Dr. Winters stated Warren has exhibited these symptoms since she was first seen on June 28, 2001, and he opined that she was not a malingerer. *Id*.

Two months later, on November 25, 2003, Warren reported that she continued to suffer from paranoia "about almost anything . . . because of too much stress." R. 455. Warren also reported that she was experiencing non-command audiovisual hallucinations "like weird dreams" and that she heard her name being called. *Id*. Warren also reported that she was restless with poor sleep and appetite, therefore, the dosage for Prozac was increased. *Id*. On January 24, 2004, Warren reported "some distressing thoughts and audiovisual hallucinations 'threats,' but denies self-destructive/aggressiveness. R. 453. Additionally, on this date Dr. Winters noted that Warren had frequent smiling and laughter when explaining her situation. *Id*.

On January 29, 2004, Warren again reported audio hallucinations of a "knock at the door" or visual hallucinations of something moving.  R. 453.  On February 26, 2004, Warren described an incident where she thought someone was sneaking up behind her, and that sometimes she hears things but tries not to let it upset her.  R. 452.  Dr. Williams noted incongruent laughter by Warren when describing distress.  *Id.*

Warren reported on March 24, 2004, that she continued to have persistent audiovisual hallucinations that are non-command in nature.  R. 451.  At the following visit, Dr. Winters noted that Warren had been experiencing persistent panic when overwhelmed, and noted that she laughed when describing her distress, probably due to anxiety.  R. 450.  Warren also stated that her "sleep and appetite are sporadic."  *Id*.  Warren stated that she "still . . . imagine somebody walking past me," but that the hallucinations were non-command in nature.  *Id*.  On May 19, 2004, Warren reported her persistent sense that she is being watched, that she "sees things," that she is hypervigilent and guarded.  R. 449.

Dr. Winters, at the June 4, 2004 visit stated that Warren's illness is a chronic, progressive disease.  R. 448.  He also certified that the findings in the mental impairment questionnaire he completed on September 15, 2003, remained the same.  R. 447.

On August 5, 2002, consultative examiner, Malcolm Graham, III, Ph.D., evaluated Plaintiff. R. 309-12.  Plaintiff reported treating with psychiatrist, Dr. William Winters, on a monthly basis for depression and anxiety.  R. 311.  She never made a suicidal gesture or attempt, and has never been hospitalized for emotional or behavioral problems.  *Id.*  Dr. Graham saw no evidence of a depressed or anxious mood.  *Id*.  Plaintiff's affect was appropriate, with no indications of blunting, flatness, or

lability. *Id*. She showed no indication of tangential or circumstantial thinking, and she could relate information in a rational, coherent, and sequential fashion. *Id*. Plaintiff answered questions fairly easily and with little prompting. R. 310. During her evaluation, there were possibly some problems in her attention and concentration, but it was difficult to tell whether this was due to a minimal effort or possible effects of anxiety. R. 309. Dr. Graham also noted that Warren has a noticeable hearing problem. R. 311. Dr. Graham's multi-axial evaluation was as follows: Axis I – possible dysthymia[6] by report; Axis II – V71.09 [no diagnosis]; Axis III – vague physical complaints by report; Axis IV – vocational problems; Axis V – Current GAF: 65-75; Highest GAF Past Year: 65-75. R. 310.

At the hearing, Warren testified that she heard voices in her head trying to get her to do something she did not want to do. R. 504-05. Warren testified the voices would tell her things like not to care about anything, that nobody cares about her so why should she care about them. R. 505. Warren also testified that she was seeing things that were not there, that she could not sleep at night, that she could not eat and that she was very unhappy and crying a lot. R. 504. She also testified to having anxiety attacks and that she fears everything. R. 503. Warren also stated that she is "petrified of water," and has difficulty bathing. R. 509.

### 2.    Plaintiff's Physical Condition

Plaintiff testified that she drives her husband to and from work, which is 30-35 miles each way. R. 510, 517. After she takes her husband home from work, she drives her son to work or picks up the

---

[6]Dysthymic disorder (or dysthymia) is a depressive mood disorder. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) [hereinafter "DSM-IV"]. The diagnostic criteria for dysthymic disorder is a depressed mood for most of the day (for more days than not) for at least two years, with the presence of two or more of the following: poor appetite or overeating; insomnia or hypersomnia; low energy or fatigue; low self-esteem; poor concentration or difficulty making decisions; feelings of hopelessness. DSM-IV at 349. The DSM-IV diagnosis code provides no severity specifier for dysthymic disorder.

younger children from school.  R. 510.  The driving distance for her son's job is 15-20 miles.  R. 518.

She also picks her son up from work at midnight or one o'clock.  R. 510.  Warren also took care of

her two younger children going to school every day, and running errands.  R. 518, 522.

Plaintiff underwent a consultative examination on August 21, 2002, performed by Dr. Hugh

Coleman, D.O., P.A.  R. 313-17.  She complained of decreased hearing, hypertension, low back pain,

obsessive compulsive disorder and mental disorders.  R. 316.  Plaintiff was not wearing hearing aids,

but was able to understand conversational speech when asked questions without facing the questioner.

R. 315.  She did not need to have any questions repeated with the exception of when she was asked

about her hearing; then she needed every question repeated. *Id*.  Otherwise, she was able to appreciate

conversational speech without difficulty.  *Id*.  Plaintiff testified at the hearing that she stopped wearing

a hearing aid in 1999, and that she has to read lip a lot.  R. 521.

During the review of systems, Plaintiff indicated that she was positive for everything.  R. 315.

When asked about high blood pressure, Warren stated that she had nosebleeds, but she could not recall

when.  *Id*.  With regard to chest pain, she stated she had chest pain lasting up to two hours, relieved

with Tylenol, associated with whatever factors were asked about, such as tingling of her hair and

tingling of her toes.  *Id*.  Plaintiff reported suffering from every complaint she was asked about.  *Id*.

On physical examination, Plaintiff's range of motion was normal in all areas.  R. 317.  Straight

leg raising tests were negative in the seated and supine positions; grip strength in the upper extremities

was 4/5 bilaterally; and fine manipulation was within normal limits.  R. 314.  Plaintiff showed poor

effort on strength testing against resistance of the shoulders.  *Id*.  She was able to open the door with

both hands and could button and unbutton clothes without difficulty.  *Id*.  Plaintiff showed no evidence

of edema, ulcerations or varicosities in her lower extremities.  *Id*.  Muscle strength was 4/5 with poor

effort.  *Id*.  Neurological examination was normal.  Sensation was intact; deep tendon reflexes were

2+/4.  R. 313.  She had a slow, but normal gait, and normal heel and toe walking.  *Id*.  She was able

to squat half way without assistance.  *Id*. 313.

Dr. Coleman diagnosed hypertension with good control; morbid obesity; obsessive compulsive

disorder per history; low back pain, most likely due to lumbar strain from her abdominal obesity.  R.

313.  Dr. Coleman did not impose any work-related restrictions.

## B.     THE ANALYSIS

Warren assigns three errors to the Commissioner.  First, Warren claims that the Commissioner

erred in determining Warren's residual functional capacity based on the State Agency doctor without

giving greater weight to Warren's treating psychiatrist.  Second, Warren claims that the Commissioner

erred in posing the hypothetical question to the VE because the question did not adequately reflect

Warren's limitations.  Third, the Commissioner erred in not crediting Warren's testimony regarding

her limitations.  For the reasons discussed below, it is necessary for the Court to address only the first

argument.

William Winters, M.D., is a psychiatrist.[7]  R. 373 - 74.  Plaintiff began treating with

Dr. Winters on June 28, 2001, and was still treating with Dr. Winters as of the hearing on July 8, 2004.

During this time, Plaintiff saw Dr. Winters on a monthly basis.  Although Plaintiff's diagnosis varied

at first, on August 14, 2001, Dr. Winters diagnosed Plaintiff as having a Major Depressive Disorder,

---

[7] The record on appeal does not disclose whether Dr. Winters is board certified as a forensic psychiatrist by the American Board of Psychiatry and Neurology, and this Court is not permitted to make any such determination on appeal by consulting the web site of the Florida State Department of Health.

Recurrent, with Psychotic Features. This diagnosis continued through the date of the hearing.[8] Dr. Winters added a diagnosis of General Anxiety Disorder on March 6, 2002. On September 15, 2003, Dr. Winters opined that Plaintiff was unable to work because of her mental condition. Clinical findings included episodic panic attacks that cause shortness of breath, poor concentration, debilitating fear with anxiety/anergia, anhedonia, and usually disheveled, somewhat disorganized appearance. Dr. Winters confirmed that these symptoms have been present since she began treatment two years earlier. On June 4, 2004, Dr. Winters certified that the findings in the mental impairment questionnaire he completed on September 15, 2003, remained the same.

The ALJ accorded great weight to State Agency psychologist Dr. Conley's opinion,[9] because she found it was consistent with the diagnostic and clinical findings, including consultative examining psychologist Dr. Graham's assessment that Plaintiff "may" have some attention and concentration difficulties. R. 20. The ALJ gave lesser weight to Dr. Winters' assessment, finding his assessment to be "extreme and not supported by the longitudinal record." *Id*. The ALJ also determined that Dr. Winters' assessment was based on subjective reporting from the claimant, and he did no diagnostic testing regarding claimant's mental status. The ALJ also noted that Dr. Graham's assessment showed only some possible concentration/attention deficits, and that the claimant's activities of daily living are essentially unrestricted.

The ALJ is required to give substantial weight to Dr. Winter's opinion, diagnosis and medical evidence, unless good cause exists. The ALJ improperly discounted Dr. Winters' opinion. First, the

---

[8] The ALJ's decision states that Dr. Winters diagnosis was Psychosis, Not Otherwise Specified with Depressive Features and rule out a Panic Disorder. R. 18. While this was his initial diagnosis, the diagnosis changed as stated above.

[9] Although the ALJ's decision refers to State Agency psychologists (plural), there was only one – Dr. Conley.

ALJ ascribed the wrong diagnosis to Dr. Winters' assessment. Although Dr. Winters' initial diagnosis was Psychosis, Not Otherwise Specified with Depressive Features and rule out a Panic Disorder (as stated by the ALJ at R. 18), the diagnosis changed shortly afterward and remained a diagnosis of Major Depressive Disorder, Recurrent, with Psychotic Features. Second, Dr. Winters' treatment of Warren on a monthly basis for a three-year period is sufficient to establish a longitudinal record. Third, Dr. Winters is a psychiatrist. Based on his medical and psychiatric training, Dr. Winters personally and directly observed, evaluated, and recorded Plaintiff's psychiatric problems, based in part on subjective reporting from the Plaintiff. Nothing suggests, however, that Dr. Winters did not employ medically acceptable clinical and diagnostic techniques in evaluating and treating Plaintiff's mental conditions. Indeed, as Plaintiff points out, consultative psychologist Dr. Graham used the same type of mental status examination as Dr. Winters.[10]

The ALJ's reasons for rejecting Dr. Winters' opinion is inadequate. The case, therefore, is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g)(Sentence Four). On remand, the Commissioner will reevaluate the weight to be given to Dr. Winters' opinion. If Dr. Winters' opinion is not accorded substantial weight, the Commissioner will state adequate reasons for discounting the opinion.

## VI.   **CONCLUSION**

For the reasons stated above, this case is **REMANDED** to the Commissioner pursuant to Sentence Four to allow the Commissioner to reevaluate the evidence, to explain the basis for her

---

[10] In discussing Warren's credibility, the ALJ found that Warren's hallucinations were essentially controlled with Risperdal, citing Dr. Winters' records. R. 20. Dr. Winters' records, however, reflect on-going reports of audiovisual hallucinations, so the extent to which the hallucinations were "controlled" is unclear.

decision, and to hold such further proceedings as she may be advised.  The Clerk shall enter judgment

in favor of Plaintiff.

**DONE** and **ORDERED** in Orlando, Florida on January 27, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL              33602

The Honorable Philemina M. Jones
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817